### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY
### CAMDEN VICINAGE

R.G., et al.,

      Plaintiffs,

        v.

ELAINE HILL, et al.,

      Defendants.

Civil No. 15-1731 (RMB/JS)

**OPINION**

Appearances:

**Jamie M. Epstein, Esq.**
**Jonathan S. Corchnoy, Esq.**
107 Cherry Parke, Suite C
Cherry Hill, New Jersey 08002

     *Attorneys for Plaintiffs*

**William S. Donio, Esq.**
Cooper Levenson, P.A.
1125 Atlantic Avenue, Third Floor
Atlantic City, New Jersey 08401-4891

     *Attorney for Defendants*

**BUMB**, United States District Judge:

    Plaintiffs J.G. and R.G. ("Plaintiffs"), the parents of R.G., a multiply disabled student who suffers from a seizure disorder, have filed the within Complaint on behalf of R.G. Plaintiffs appeal the decision of the Honorable Todd Miller, Administrative Law Judge. Judge Miller found that the Defendant, Voorhees Township Board of Education and its named

officials did not violate R.G.'s Individualized Evaluation Plan ("IEP") that was implemented to provide R.G. a Free Appropriate Public Education ("FAPE") pursuant to the Individuals with Disabilities Education Act, 20 U.S.C. §§ 1400 et seq ("IDEA"). With respect to the appeal, Judge Miller's decision dealt with a narrow issue: whether R.G.'s IEP required the District to have a nurse physically at Voorhees Middle School where R.G. attended in the summer of 2014 as part of extended school year services ("ESY"). In a 17-page Opinion detailing his reasons, Judge Miller denied Plaintiffs' claim that Voorhees School violated R.G.'s IEP by failing to place a nurse in the building where R.G. would have received his ESY program. Opinion [ECF No. 12-7]. In their Complaint here, Plaintiffs allege violations of IDEA (Counts 1 and 2), Section 504 of the Rehabilitation Act of 1974 (Count 3); Americans with Disabilities Act ("ADA") and the New Jersey Law Against Discriminations ("NJLAD") (Count 4).

The named Defendants, the Voorhees Township Board of Education, and the individual Defendants, Elaine Hill and Diane Young (collectively the "Defendants"), now move this Court for summary judgment as to all claims against them. In response and opposition, Plaintiffs withdrew many of their claims in light of the fact that R.G. no longer resides within the Voorhees School District. Thus, the only claims remaining for this Court's decision are: whether the District violated R.G.'s IEP under

IDEA and Section 504 of the Rehabilitation Act, 29 U.S.C. § 701 et seq., Plaintiffs' claims of discrimination under Section 504, as well as claims of discrimination against the individual Defendants Hill and Young under the NJLAD.  See Plaintiffs' Brief in Support of Plaintiffs' Response to Defendants' Motion for Summary Judgment ("Pl. Br."), [Docket No. 32], at 3.[1]

## I.   FACTUAL BACKGROUND

The following facts are taken from the parties' Statements of Material Facts Not in Dispute submitted pursuant to Federal Rule of Civil Procedure 56(c) and Local Civil Rule 56.1(a).

Plaintiff R.G. was born on July 3, 2001, and has been diagnosed with numerous disabilities, including, but not limited to, a seizure disorder (Periventricular Leukomalacia), cognitive, sensory, and auditory deficits along with other learning related disabilities.  Defendants' Statement of Undisputed Material Facts ("DSUMF"), [Docket No. 29], ¶ 1; Plaintiffs' Response to DSUMF ("Pl. Resp."), [Docket No. 32], ¶ 1.  R.G. is classified as "multiply disabled," but does not

---

[1] As summarized by Plaintiffs: "Thus, the claims that remain include the following: (1) The appeal of Judge Miller's decision regarding whether the District denied R.G. a FAPE under the IDEA and Section 504 by failing to provide a school nurse within the building which the IEP team determined to be the appropriate placement for his Extended School Year (ESY) services to be given during the summer of 2014; (2)Plaintiff R.G.'s claims of discrimination against the District under Section 504, the ADA, and the NJLAD as a result thereof; and (3) R.G.'s claims of discrimination against the individual defendants, Elaine Hill and Diane Young, under the NJ LAD."

receive any treatment at home or on the weekends from a nurse. DSUMF ¶¶ 3, 5, 7; Pl. Resp. ¶¶ 3, 5, 7.

In 2009, Plaintiffs moved to Voorhees, New Jersey, and enrolled R.G. in Osage Elementary School ("Osage"). During the 2013-2014 school year, R.G. was assigned to a fifth grade class and became eligible for special education services. While at Osage, R.G. never required any form of emergency treatment by the District staff or nurse. There was never a 911 emergency call made to treat R.G. with any form of medical intervention or nursing services for his seizure disorder. DSUMF ¶¶ 7-11; Pl. Resp. ¶¶ 7-11. Moreover, R.G.'s IEP at Osage did not specify any nursing services as "related services" in any section. The IEP did, however, state "parental concerns" that when R.G. falls "we need to be informed within minutes of his fall and an incident report should be filed." Pl. Resp. ¶ 12.

**The Individualized Education Plan**

On May 28, 2014, the District held an IEP team meeting to discuss R.G.'s transition to middle school and his IEP for the upcoming 2014-2015 school year. The meeting included Dawn Danley, R.G.'s case manager, a school representative for Voorhees Middle School where R.G. would be attending, R.G.'s parents, and Dr. Howard Margolis, the educational consultant on behalf of R.G. The IEP meeting was recorded, and an IEP was implemented. DSUMF ¶¶ 14-15; Pl. Resp. ¶¶ 14-15.

4

In relevant part, the 2014 IEP provided that R.G. receive extended school year services ("ESY") during the summer, consisting of 240 minutes of Special Education for four (4) days per week, thirty (30) minutes of speech therapy, thirty (30) minutes of occupational therapy, and thirty (30) minutes of physical therapy. These services were listed in the IEP under the heading "Summary – Special Education Programs and Related Services." Notably, there were no nurse services listed under this section. The IEP did not contain any related services for the school nurse or mention any required or authorized medical interventions by the school nurse. The 2014 IEP did, however, include the following "special alert" at the top of the first page: "IF R.G. FALLS, TAKE HIM TO THE NURSE IMMEDIATELY AND NOTIFY PARENT." Relatedly, the seizure plan on file did not require any related nursing services, actual nursing services, or medical interventions. DSUMF ¶¶ 18-21, Pl. Resp. ¶¶ 18-21. Finally, as the ALJ noted, at no time during the recorded IEP did either party address whether a nurse must be physically present in the Middle School building.

**R.G.'s Placement at Voorhees Middle School**

R.G.'s ESY at Voorhees Middle School was scheduled Mondays through Thursdays, 9:00 a.m. to 1:00 p.m., commencing July 7, 2014, until August 14, 2014. R.G.'s ESY included occupational therapy, physical therapy, speech language therapy, and adult

support along with in-class special education.  The District
assigned R.G. to an ESY instructor who was a former athletic
coach.  R.G.'s ESY instructor was also trained in first aid
Cardiopulmonary Resuscitation (CPR) and Automated External
Defibrillator (AED) use.  The District also assigned an aide to
monitor and support R.G. during the ESY program.  DSUMF ¶¶ 32-
36, Pl. Resp. ¶¶ 32-36.

The District also employed two staff nurses for its three
district buildings that were open during the summer.  Although
no nurse would be staffed at Voorhees Middle School, where R.G.
would be attending, the District contended that the nurses were
located at school buildings within 5 to 10 minutes of the Middle
School.  Plaintiffs, however, deny that the nurse was minutes
away.  Pl. Resp. ¶ 31.

When the ESY program began, Plaintiffs refused to send R.G.
to Voorhees Middle School because they learned that a nurse was
not physically present at the school.  See 12/22/2014 Tr. [ECF
No. 12-3] at 288:13-14.  Plaintiffs admit that they had
"presumed" that a school nurse would be present.  Pl. Resp. ¶ 28
("[T]he Plaintiffs admittedly presumed that a school nurse would
be in the VMS and, therefore, no additional statement regarding
nursing related services [in the IEP] was needed.").  As
discussed, supra, the IEP does not explicitly state that a nurse

would be physically present at the school and no nursing

services are listed as related services.

In response to Plaintiffs' refusal to send R.G. to school,

the District offered R.G. several alternatives:  a one-on-one

aide; the opportunity to move to Signal Hill, another elementary

school occupied with a summertime nurse (which placement had

previously been rejected by the IEP team due to R.G.'s age); and

homebound instruction ESY services to be provided by the

District in the home of R.G.  Plaintiffs declined each of these

offered alternatives and, consequently, R.G. did not receive

ESY.[2]  Pl. Resp. ¶¶ 38-41.

---

[2] As mentioned above, many of Plaintiffs' claims have been
withdrawn.  Judge Miller did find, however, that the District
had to offer R.G. compensatory services for the educational and
therapeutic programs he missed during the summer of 2014.  Op.
at 16 ("[T]he court's directive to provide[] compensatory
education is not tantamount to deeming petitioner's a prevailing
party but rather is just a reminder that R.G. is entitled to
receive what was lost during the summer of 2014.").  Plaintiffs'
response is that: "[A]ny such claim for future relief is hereby
withdrawn.  Furthermore, also because R.G. no longer resides within
the District, any claim for Compensatory Education Services found
by Judge Miller to be owed to R.G. cannot realistically be provided
by the District and, if the Court should find that Plaintiff, R.G.,
is due such relief, then the relief needs to be converted into some
fund to be used for such Compensatory Education Services or
converted into an award of monetary relief in trust for Plaintiff,
R.G.  Furthermore, because the primary purpose of the Extended
School Services (ESY) during the summer of 2014 was to acclimate
R.G. to Voorhees Middle School (VMS), R.G.'s new school since he
graduated from his elementary school, that purpose is and was moot
as soon as R.G. started school in VMS in the Fall of 2014."  Pl.
Br. at 2.  It is not at all clear to this Court exactly what
Plaintiffs mean by, or by what authority they seek, a "fund . . .
to be converted into an award of monetary relief in trust for
Plaintiff."  If Plaintiffs wish to pursue such argument, they may

**The Due Process Hearing**

On September 4, 2014, Plaintiffs petitioned for relief with the Office of Special Education Programs ("OSEP") alleging that the District violated the IDEA by not complying with the 2014 IEP by failing to provide a nurse at the Voorhees Middle School.[3] The due process hearing was held over the course of several days, and Judge Miller heard the testimony of several witnesses.

**The ALJ Decision**

Judge Miller issued his decision on February 6, 2015, finding that the District had met its burden of proving that the IEP was designed to provide R.G. a FAPE, and that the District was not required to have an on-site school nurse for ESY.  Judge Miller also concluded that even if the IEP required that a nurse be physically present at the Middle School, there was no substantial violation of the IEP by the District.  As he held:

> The absence of any specific "related services" for the nurse in the IEP; the short durations of the seizures; lack of any prior treatment for seizures by the nurse; the lack of a nurse at home where R.G. spends the majority of his time; the lack of a nurse on field trips, vacations, and all events outside school; the

file a motion for reconsideration that clearly sets forth the basis for such relief and showing cause for their failure to present such basis here.

[3] Parents who are dissatisfied with the services or lack of services by a school district may challenge the IEP through a due process petition before an administrative law judge.  20 U.S.C. § 1415(b)(6).  The Plaintiffs did not challenge the substantive academic and thereapeutic program contained in the IEP.

extensive safety precautions taken by the district;
and the historical evidence indicating that the role
of the school nurse was that of a report generator,
leads me to **CONCLUDE** that if two nurses were in nearby
buildings but not in R.G.'s building, it would be a <u>de
minimis</u> IEP deviation.

Op. at 15.

In summary, Judge Miller concluded:

[T]he district was not required by law or in the
student's IEP to provide an "onsite school nurse" for
extended school year services (ESY); 2) the district
did not change or amend the school nurse provision in
the IEP without petitioner's consent; 3) petitioner
missed a significant portion of his 2014 ESY by his
own choice and not by the district's doing (P-8; R-
16); and 4) petitioner is entitled to compensatory
services notwithstanding the dispute herein.

<u>Id.</u> at 16.

As discussed, the sole issue presented to Judge Miller was
whether or not the language in the IEP that stated that if R.G.
falls, "take him to the nurse immediately and notify parent,"
required the school district to have a nurse on the school
premises.  Petitioners/Plaintiffs contended that it did, and
because a school nurse was not at the Voorhees Middle School,
the District violated the IEP.  Judge Miller's decision set
forth his various conclusions.

First, Judge Miller concluded that, by statute, the
District was not required to have a school nurse physically
present at every school campus during the school year or during
its summer program.  He ruled:

> Every board of education is required to hire at least
> **one** certified school nurse. <u>N.J.S.A.</u> 18A:40-1. The
> statute does not require the position to be full-time
> <u>Ramsey Teachers Assoc. v. Bd. of Educ. Boro of Ramsey</u>,
> 382 <u>N.J. Super</u>, 241, 246 (App. Div. 2006).

<u>Id.</u> at 9.

The ALJ held that the school's belief that the provision only required that the nurse be on staff within the district was logical. "The district understood and interpreted the nursing provision to mean a nurse had to be on staff within the district at all times and that any time R.G. fell, a nurse must determine whether the fall was caused by a seizure, or caused by an accident unrelated to a seizure." This was similar to the testimony given by R.G.'s mother at the hearing. She testified that: "[T]he primary reason for the nurse to see R.G. after a fall was to document the reason for his fall so as to inform his treating physicians. If the seizures were occurring too often his medications could be adjusted, if needed." Op. at 10. The ALJ also found that prior statements made by Plaintiffs to District staff supported the District's interpretation of the language, that is, that the District need only have a nurse on staff in District and available, not that the nurse be physically present at Voorhees Middle School:

> This conclusion is supported by prior statements of
> petitioners to the district staff. On June 4, 2014,
> the school nurse recorded that Mrs. G. was upset about
> nobody notifying her that – 'R.G. falling a few times
> on May 27th. I'm not blaming you, but somebody is at

fault for not notifying me.'  She, (R.G.'s mother) would like an accident report each time he falls (R-10; R-12:14)."

Id.

Indeed, as Judge Miller noted, the exact language in the "Parental Concerns" section of the IEP stated that when R.G. falls, "we need to be informed within minutes of his fall and an incident report should be filed.  Id.

The ALJ also concluded that R.G.'s IEP history supported the District's interpretation of the IEP language:

> Indeed, R.G.'s prior IEP's, while he was with other school districts, did not have any nursing provisions or special nursing alerts.  There was also no evidence that R.G. required nursing level treatment for his seizures.  The 2010 seizure action plan prepared by R.G.'s treating doctor simply states contact the school nurse (R-9).  Likewise, there were no specific nursing 'related services' identified or included in R.G.'s IEP.

> The nurse never treated R.G. for a seizure and never observed any seizures in the two preceding years while R.G. [w]as attending the Osage school.  The only way the nurse was able to document a seizure was by discussing the underlying circumstances and observations with those who were present, if or when, R.G. fell.  For example, on October 24, 2014, the school noted that 'Mrs. Dinocolas states at the field trip to the Acme (R.G.) had pause for two seconds around 10:00 a.m., teacher not sure if it was a seizure.  Notified dad' (R-11).  Mycolonic seizures involve short stares, muscle twitches, laughing, hiccupping according to the school nurse and petitioners (R-9).  That is why the nurse did not observe or treat R.G. for any seizures over the past two years.  Her role was to simply report what the teachers observed and/or treated R.G. for minor cuts or bruises, if needed (R-10-12).

Id. at 10-11.

Finally, Judge Miller noted that R.G. never "required a private nurse, for safety or medical purposes, in his private life, either after school or on weekends." Id. at 11. Likewise, he found:

> It follows that if R.G. did **not** require clinical nursing services after school or on weekends; and did **not** require any related (skilled) nursing services from the school nurse while at school, then he did not need a school nurse to be on standby in the same building while he attended summer school, in the event he 'fell or falls.' I so **CONCLUDE**. There is an absence of medical and factual basis demanding such high level of service. Two years of nursing reports clearly demonstrate that majority of time when R.G. fell at school was entirely unrelated to seizure activity (R10-12). The nurse would simply treat a scrape, bump or bruise, if any, just like she would for all other children, and notify petitioners. The two nurses within the district during ESY could provide this level of service.

Id. at 11-12.

The ALJ further held that putting aside the contested language of the IEP, the District offered measures that would address the Plaintiffs' concerns relating to a potential fall by R.G. The ALJ held:

> [N]otwithstanding the disagreement over the nursing language, the district remained ready, willing and able to provide R.G. his entire panoply of ESY (academic and therapeutic) services at the VMS during the summer of 2014 (R-5). When petitioners expressed concern that a nurse would not be in their child's building, a one-on-one aid was offered to assuage petitioners' concerns and ensure that R.G. was protected from falls or injury (R-5). Indeed, the ESY special education teaching staff was apprised of all

12

unique needs for their summer students, including R.G. R.G.'s special education teacher was trained in first aid, CPR and use of an AED device (P-6). Therefore, substantial precautions were instituted for R.G. and others.

The district also tried to accommodate petitioners in other ways including moving R.G. to a build[ing] with a (summer time) school nurse (R-15). The building location was different but the academic and therapeutic services were substantially similar (R-14). Major differences were the grade level of the children. The modified location included third, fourth and fifth graders whereas the children at VMS would be students in sixth, seventh and eighth grade. Special education students can be mixed with different aged students for up to four grades. N.J.A.C. 6A:14-4.7(a)(2). Indeed, R.G. would also lose the opportunity to become familiar with (transition) into the VMS building and become familiar with the building layout and students over the six weeks of summer. This was an important consideration for petitioners, so they rejected the district's accommodation offer.

Finally the district offered petitioners home schooling if they were not going to agree to send R.G. to the VMS for the six-week summer program. This too was rejected by petitioners.

I am mindful that the alternatives offered by the district were not ideal from petitioners' prospective and the alternatives had some legitimate academic flaws as discussed by Dr. Margolis. But these alternatives illustrated that the district was attentive to the circumstances and looked for options to resolve the impasse.

Id. at 14.

**The Appeal**

Plaintiffs appealed the ALJ's decision on March 9, 2015, Compl. [ECF No. 1], asking this Court to overturn the ALJ's decision. The party challenging the ALJ's decision bears the

burden of persuasion before this Court.  Ridley School District
v. M.R., 680 F.3d 260, 271 (3rd Cir. 2012)("We now join our
sister circuits in holding that the party challenging the
administrative decision bears the burden of persuasion before
the district court.").  Thus, because Plaintiffs lost before the
ALJ and are challenging that decision, they bear the burden of
persuasion.  Ridley, 680 F.3d at 270, n.3 ("Our conclusion today
that the burden lies with the party challenging the
administrative decision is entirely consistent with our previous
cases, in which we held that the burden was properly placed on
the parents before the district court.  In those cases, the
parents were the losing party before the hearing officer and
challenged the hearing officer's decision in district court.")
The reviewing court shall receive the administrative record,
"hear additional evidence" upon request, and base its decisions
upon "the preponderance of the evidence," granting "such relief
as the court determines appropriate."  20 U.S.C. §
1415(i)(2)(C).  The District now moves for summary judgment,
asking this Court to affirm the ALJ's decision.

## II.  **LEGAL ANALYSIS**

### Summary Judgment

        In the context of the IDEA, a motion for summary judgment
is "the procedural vehicle for asking the judge to decide the
case of the basis of the administrative record."  M.A. v.

14

Voorhees Twp. Bd. of Educ., 202 F. Supp. 2d 345, 359 (D.N.J. 2002) (quoting Heather S. by Kathy S. v. Wisconsin, 125 F.3d 1045, 1052 (7th Cir. 1997)), aff'd., 65 F.3d 404 (3d Cir. 2003); see 20 U.S.C. § 1415(i)(2). As the statute dictates, the Court may also hear additional evidence if offered by the parties, although none was received here.

The Court undertakes a "'modified de novo' review." S.H. v. State-Operated Sch. Dist. of Newark, 336 F.3d 260, 270 (3d Cir. 2003); H.M. v. Haddon Heights Bd. of Educ., 822 F. Supp. 2d 439, 445 (D.N.J. Sept. 27, 2011). The Third Circuit in D.S. v. Bayonne Board of Education, 602 F.3d 553, 564 (3d Cir. 2010) (citations omitted), expounded upon that standard:

> When considering an appeal from a state administrative decision under the IDEA, district courts apply a nontraditional standard of review, sometimes referred to as a "modified de novo" review. Under this standard, a district court must give "due weight" and deference to the findings in the administrative proceedings. Factual findings from administrative proceedings are to be considered prima facie correct, and if the reviewing court does not adhere to those findings, it is obliged to explain why. The "due weight" obligation prevents district courts from imposing their own view of preferable educational methods on the states.

Moreover, when an ALJ has heard live testimony and made credibility determinations, the judge's findings are given "special weight," and the reviewing Court must accept them unless specifically identified extrinsic evidence in the record justifies a contrary conclusion. Id. at 564; S.H., 336 F.3d at

15

270-71.  As for the administrative law judge's legal determinations, they are reviewed de novo.  Muller v. Comm. on Special Educ., 145 F.3d 95, 102 (2d Cir. 1998); P.N. v. Greco, 282 F. Supp. 2d 221, 235 (D.N.J. 2003).

For the reasons set forth below, the Court finds that Defendants did not violate the terms of the IEP.

**IDEA Claim**

IDEA requires access to a FAPE, which means "special education and related services" for children with disabilities that are, in relevant part, provided in conformity with the individualized education program under Section 1414(d) of IDEA. 20 U.S.C. § 1401(9).  In relevant part, "related services" means "school nurse services designed to enable a child with a disability to receive a free appropriate public education as described in the individualized education program of the child." Id. at § 1401(26).  "Related services" also means medical services, "except that such medical services shall be for diagnostic and evaluation purposes only."  Id.  To meet this obligation, every school district must develop an IEP for every disabled child that consists of "a specific statement of a student's present abilities, goals for improvement of the student's abilities, services designed to meet those goals, and a timetable for reaching the goals by way of the services." Holmes v. Millcreek Twp. School District, 205 F.3d 583, 589 (3d

Cir. 2000).  The IEP must provide a plan that is designed to provide "significant learning" and "meaningful benefit" to the child.  Ridgewood Board of Education v. N.E., 172 F.3d 238, 247 (3d Cir. 1999).

In determining whether a school district provided a FAPE, there is a two-part inquiry.  First, a court evaluates whether the school complied with IDEA's procedural requirement.  Second, a court evaluates whether the IEP was "reasonably calculated to enable the child to receive education benefits."  Westchester Ctny. v. Rowley, 458 U.S. at 207.  Only the second question is at issue here.  Plaintiffs do not allege that the District failed to implement an IEP that provided R.G. a FAPE, but rather, that the District failed to comply with the IEP that was implemented.

Thus the sole issue is whether the District failed to comply with the 2014 IEP by not having a school nurse on-site. The 2014 IEP did not contain any provision for a school nurse under "related services."  See 20 U.S.C. § 1401(26)(A) (defining "related services" as those services that are "required to assist a child with a disability to benefit from special education").  The only provision in the 2014 IEP that referenced a nurse is the top of the first page under "Special Alerts", stating "[I]F [R.G.] FALLS, TAKE HIM TO THE NURSE IMMEDIATELY AND NOTIFY PARENT."  See J.T., 533 Fed. Appx. at 45 (a school

district should follow what is "specified in the student's IEP").

At the due process hearing, the ALJ held that the District bore the burden and production that it did not violate R.G.'s IEP. The District presented the testimony of Dr. Hill, Director of Special Services for the District, who testified regarding the difference between "nursing services" required for a special needs student to learn and those that were required for R.G. in the 2014 IEP. DSUMF, ¶¶ 58, 67, 70, 79. Dr. Hill noted that R.G.'s nursing services were not written into the 2014 IEP as substantive requirements, i.e., "related services," id. ¶ 59, a fact not genuinely contested, but were extraordinary precautions taken for R.G.'s safety. There is, in fact, a difference between school nurse services necessary to permit the child to benefit from instruction and precautionary measures. Cf. Cedar Rapids v. Cmty. Sch. Dist. v. Garret F. by Charlene F., 526 U.S. 66 (1999) (finding that a wheelchair-bound student on a ventilator required the school district to provide the student with nursing services during the school day as "related services"); Irving v. Independent School Dist. v. Tatro, 468 U.S. 883 (1984) (finding that a student requiring a clean intermittent catheterization was a "related service" and the school district was required to provide to comply with its requirements for a FAPE). There was no evidence that the

District possessed to demonstrate to it that R.G. needed an on-site nurse to benefit from school instruction. To the contrary, the record demonstrated that the seizure plan on file with the District did not require any related nursing services, actual nursing services, or medical interventions. At no time during the IEP did Plaintiffs contend that an on-site nurse was required for R.G. to learn. Indeed, R.G.'s mother testified that the "special alert" in the IEP was a precautionary warning for reporting purposes to R.G.'s doctor. Thus, the District was only obligated to take the precautionary measures set forth in R.G.'s 2014 IEP, including that "[i]f [R.G.] falls, take him to the nurse immediately and notify parent." Id. ¶ 17, 67. Thus, the Court agrees that the District's interpretation of the IEP was logical. As discussed above, nursing services were not under "related services." And, although the IEP language stating that R.G. should be taken to the nurse "immediately" led Plaintiffs' to assume that a school nurse would be on-site, that does not translate to an illogical interpretation of the IEP on behalf of the District. R.G.'s prior IEPs did not have nursing provisions or any provision stating that R.G. required nursing level treatment for his seizures. Moreover, in the two preceding years while R.G. was at Osage, the nurse never treated R.G. for a seizure or observed any seizures. The nurse's role amounted to reporting what the teachers observed or treating

R.G. for minor cuts or bruises.  There was also neither evidence nor a contention from Plaintiffs contend that R.G. required a private nurse after school or on weekends.

Plaintiffs contend that the District bore the burden of proving by expert medical testimony that R.G. did not need the on-site nursing support, and that it failed to meet such burden because it presented no such testimony.  Plaintiffs introduced a written note, written on the date of his first day of summer school by Nurse Practitioner Joan Blair from Nemours, stating that an on-site nurse was "medically necessary."  Plaintiff also contends that the ALJ should have permitted them to introduce her telephonic testimony and that her opinion should have been given greater weight as a physician's assistant.  As the record demonstrates, Nurse Blair was unable to attend the hearing and Judge Miller denied Plaintiffs' request to present telephonic testimony.  The Court does not agree with Plaintiffs' contentions.

For the reasons articulated above, the Court finds that the District met that burden, as the ALJ found.  Plaintiffs contend that only a "physician trained in the treatment and care of seizure disorders like R.G.'s seizure disorder could give competent medical evidence as to what kind of nursing support R.G. needed."  Pl. Opp. Br. at 8.  The District, however, met its burden by introducing other pieces of evidence described

above.  Plaintiffs could have introduced such medical testimony
before the ALJ, and this Court, but did not.  In sum, the
District met its burden before the ALJ that the nurse was not
necessary to ensure R.G.'s "meaningful participation in
educational activities and meaningful access to education
benefits."  Ridley Sch. Dist. V. M.R., 680 F.3d at 280-81 (3d
Cir. 2012).

Finally, as the ALJ concluded, notwithstanding the parties'
dispute over the IEP nursing language, the District produced
evidence that it provided a one-on-one aide and offered a one-
on-one aide for ESY.  R.G.'s classroom instructor was informed
of R.G.'s condition and was trained in first aid, CPR, and AED
use.  The IEP program must provide a "basic floor of
opportunity" for the student, but it need not provide "the
optimal level of services," or fulfill every program request by
the child's parents.  Ridley, 680 F.3d at 260, 268-69 (internal
quotations omitted).  IDEA reflects the legislative intent
behind its promulgation, which was to provide public education
opportunities to disabled children, but not to impose such a
substantive burden on the states that goes beyond what is
necessary to make such access meaningful.  Rowley, 458 U.S. at
192 (1982).

For the reasons set forth above, the District met its
burden of proving that it did not violate the IEP, and that it

took measures to ensure that safety measures were in place for R.G. in the event he had a seizure.  Plaintiffs do not contest the substantive aspects of the IEP that went to the instructional education.  In short, there is no genuine dispute of fact as to this claim.  Summary judgment is thus entered in favor of the Defendants.

## Section 504 Claim

Plaintiffs also allege that the Defendants violated Section 504 of the Rehabilitation Act.  The Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination" under any program that receives federal funds.  29 U.S.C. § 794(a).  This prohibition was extended to public school systems through § 504 of the Rehabilitation Act.  Plaintiffs are required to prove that (1) R.G. was disabled; (2) he was "otherwise qualified" to participate in school activities; (3) the District received federal financial assistance; and (4) R.G. was excluded from participation in, denied the benefits of, or subject to discrimination at Voorhees Middle.  Ridgewood Bd. of Educ., 172 F.3d at 253.  Only the fourth element is in dispute here. Section 504 is similar to IDEA in that it requires public schools to provide a FAPE, that is, to reasonably accommodate

the needs of the disabled child so as to ensure meaningful
participation in educational activities and meaningful access to
educational benefits.  Ridley, 680 F.3d at 281.  There is simply
no evidence in the record that R.G. was denied an education
required under the Rehabilitation Act.  Summary judgment is
entered in favor of Defendants.

**Remaining Claims**

Plaintiffs' remaining claims fare no better.  To make out a
claim of disability discrimination under the ADA, a plaintiff
usually must establish that he (1) has a disability, (2) is a
qualified individual, and (3) has suffered an adverse action
because of that disability.  Turner v. Hershey Chocolate USA,
440 F.3d 604, 611 (3d Cir. 2006)(describing prima facie case
under ADA in employment discrimination context); Margot Nusbaum
v. CB Richard Ellis, Inc., 171 F.Supp.2d at 387 (same).  A
plaintiff may also state a claim for violation of the ADA by
showing that he (1) has a disability, (2) is otherwise qualified
to participate in a program, and (3) was denied the benefits of
the program or discriminated against because of the disability.
See Millington v. Temple Univ. Sch. of Dentistry, 261 F. App'x
363, 365 (3d Cir. 2008); Iseley v. Beard, 200 F. App'x 137, 142
(3d Cir. 2006).

A claim under NJLAD relies on the same analytical
framework.  McNemar v. Disney Store, Inc., 91 F.3d 610, 618 (3d

Cir. 1996).  Again, there is nothing in the record that demonstrates that Defendants[4] denied R.G. an education based on his disability.

Accordingly, for the foregoing reasons, summary judgment is granted in favor of Defendants.


Dated: <u>June 5, 2017</u>


<div style="margin-left:40%">

<u>s/Renée Marie Bumb</u>
RENÉE MARIE BUMB
United States District Judge

</div>

---

[4] Because this Court finds no grounds for liability, it need not address the issue of individual liability separately.